# ALOYSIUS W. LAUCK v. MICHAEL J. REIS, Appellant.

### Division One, July 30, 1925.

1. **NEGLIGENCE: Contributory: Matter of Law.** In an action for personal injuries wherein defendant is charged with the negligent operation of his automobile on a public street, wherein the answer is a general denial, defendant is precluded from proving contributory negligence, which, being an affirmative defense, ordinarily must be pleaded; and in such case, upon a demurrer to the evidence, it cannot be ruled as a matter of law that plaintiff's own evidence convicts him of contributory negligence, where, allowing to him every reasonable inference which a jury might draw from all the facts and circumstances, as must be done, his evidence does not establish contributory evidence as a matter of law.

2. ————: **Automobile in Public Street: Instruction: In Harmony with Valid Statute.** An instruction telling the jury that "it was the duty of any one operating an automobile on the public streets . . . to exercise the highest degree of care to avoid injury, and to run same in a careful and prudent manner and at a rate of speed not to endanger the life or limb of any person," in the language of a valid statute then in force, is not erroneous.

3. **CONSTITUTIONAL LAW: Enactment at Special Session: Motor Vehicle Act of 1921.** The proclamation of the Governor convening the General Assembly in extraordinary session "to consider and enact such legislation" as may seem proper "concerning the subjects" of "road legislation generally" and "such other matters and subjects as may be recommended by the Governor by special message to the special session of the General Assembly for its consideration after it shall have convened," and a special message thereafter addressed to the Senate and House, separately, wherein he stated that "the subject of regulating or licensing motor vehicles, and fixing the amount and manner of collecting such registration and license fees, is probably germane to that part of the call for this session which submits the road legislation. Nevertheless, you may desire to call upon motor licenses as a means of producing a maintenance fund for the roads to be constructed, and in order that there may be no doubt about it I submit this subject also," were a sufficient compliance with the constitutional provisions relating to special sessions of the Legislature and its powers to

enact laws at such sessions, and authorized the enactment at the Extra Session of 1921 of the "Motor Vehicle Act," not only "licensing" motor vehicles, but "regulating" their operation by requiring them to exercise the highest degree of care to avoid injury, and to run in a careful and prudent manner on public streets and at a rate of speed not to endanger life or limb. Nor did the fact that the special message was addressed to the Senate and House separately make it any the less a message to the General Assembly.

4. NEGLIGENCE: Instruction: Comment: Automobile Near Street Car. In an action for personal injuries due to the negligent operation of an automobile in a public street, an instruction telling the jury that if they find that plaintiff was in the public street "near the east-bound street-car track and near" another cross street "for the purpose of boarding an east-bound street car at that point," etc., does not unduly emphasize the fact that plaintiff was near the east-bound street-car track for the purpose of boarding a car, and is not a prejudicial comment on the evidence, where the evidence is uncontradicted that plaintiff was at the particular point for the purpose of boarding a street car and was injured near the east-bound street-car track.

5. ———: ———: Possible or Practicable. An instruction telling the jury that it is the duty of an operator of an automobile to run or drive it as near the right-hand curb of the street "as possible or practicable" is not erroneous. "Possible" and "practicable" are synonyms, and the statute uses the one, and the ordinance the other.

6. ———: ———: Conflict: Striking out Withdrawn Charge. An instruction for plaintiff, from which the court, before giving it, strikes out a certain charge of negligence, does not conflict with one given for defendant by which the charge is withdrawn from the consideration of the jury.

7. ———: ———: Withdrawing Issue. Where the evidence on an issue is clearly conflicting the court does not err in refusing to give defendant's requested instruction withdrawing the issue from the jury's consideration.

8. ———: ———: Speed: Keeping Near Curb. It is not error to submit the case on defendant's alleged violation of the ordinance limiting the speed of automobiles to ten miles an hour and requiring the vehicle to keep as near the right-hand curb as possible, where defendant's own testimony convicts him of having violated both requirements.

9. ———: Excessive Verdict: $8,500. Plaintiff was a robust man, engaged in lifting heavy burdens, and was fifty-six years of age.

He was run down in a public street by defendant's automobile. He sustained a concussion of the brain, severe burns, a fracture of the fibula of the right leg, and various bruises and abrasions about the hips, chest and abdomen, and numerous injuries to the pelvic bones and spinal vertebrae, and his injuries are permanent, and as a result of them he can never again engage in his former employments. *Held*, a verdict for $8,500 is not excessive.

Corpus Juris-Cyc. References: Constitutional Law, 12 C. J., Section 222, p. 794, n. 26. Damages, 17 C. J., Section 408, p. 1091, n. 85. Evidence, 23 C. J., Section 1900, p. 102, n. 6. Motor Vehicles, 28 Cyc. p. 49, n. 46, 47. Negligence, 29 Cyc. p. 581, n. 1, 4. Statutes, 36 Cyc. p. 944, n. 41; p. 945, n. 42; p. 1114, n. 96; p. 1115, n. 98, 99, 1, 2; p. 1128, n. 58. Trial, 38 Cyc. p. 1543, n. 69; p. 1602, n. 58; p. 1667, n. 85.

Appeal from St. Louis City Circuit Court.—*Hon. George E. Mix*, Judge.

AFFIRMED.

*Brackman, Hausner & Versen* for appellant.

(1) Unless the act passed at an extraordinary session deals with a subject specially designated in the proclamation of the Governor calling said extra session or designated and recommended by special message from the Governor to said Assembly at said session, the act is unconstitutional and void because it is violative of the Constitution of Missouri. Art. 4, sec. 55, Art. 5, sec. 9, Mo. Constitution. (2) Instruction 1 was erroneous because it was based upon an act passed at an extraordinary session held in 1921, which attempted to repeal Chap. 71, R. S. 1919, entitled "Motor Vehicles," which act was unconstitutional in that it was passed at an extraordinary session of the Legislature in violation of the provisions of Article 4, Section 55, Constitution of Missouri. State ex rel. Rice v. Edwards, 241 S. W. 945; Wells v. Railroad, 110 Mo. 286; St. Louis v. Wetthaus, 90 Mo. 646. (3) Instruction 1 singles out and gives undue prominence to a particular fact. This is error and has ofter been condemned in this State. Spohn v. Mo. Pac. Ry. Co., 87 Mo. 74; Dobbs v. Cates' Estate, 60 Mo. App. 658. (4) Instruction 1 conflicts with and contra-

dicts defendant's Instruction 2, and had a tendency to mislead and confuse the jury. It was therefore erroneous. Porter v. Mo. Pac. Ry. Co., 199 Mo. 82. (5) Instruction 1 is erroneous because it is indefinite, misleading and confusing in instructing the jury that it was the duty of an operator of an automobile to drive the same as near the right-hand curb as "possible" or "practicable," the terms being contradictory and misleading. Dunn v. Dunnaker, 87 Mo. 597. (6) The verdict of the jury was excessive and was the result of passion, prejudice and mistake on the part of the jury. When the verdict is grossly excessive, revealing the passion and prejudice of the jury against the defendant, it should be set aside and a new trial granted. Hewitt v. Steel, 118 Mo. 463; Burdick v. Railroad, 123 Mo. 221; Chitty v. Railroad, 148 Mo. 64; Smoot v. Kansas City, 194 Mo. 513; Chitty v. Railroad, 166 Mo. 435; Zeiler v. Met. St. Ry. Co., 153 Mo. App. 613; Dent v. Traction Co., 145 Mo. App. 61.

*Banister, Leonard, Sibley & McRoberts* for respondent.

(1) Plaintiff's instruction 1 was properly given, because: (a) The Motor Vehicle Act is, in fact, constitutional, as the Governor did specifically call the subject-matter to the attention of the General Assembly convened in special session. Proclamation of Governor, Par. 4, House Journal, p. 1355, and Special Message of June 22, 1921, House and Senate Journals, Appendix, vol. 1, p. 7. (b) The declaration about the highest degree of care in the instruction is immaterial, anyway. Liability of the defendant was not prejudiced on this declaration. (c) The statutes and the ordinance (apart from the Motor Vehicle Law of 1921) required an automobile driver to use the highest degree of care, particularly when driving on a congested street, following a street car, which was stopping or stopped to take on or let off passengers at a regular place and a street cross-

ing. Berry, Automobiles (4 Ed.) sec. 439; Bongner v. Ziegenhein, 165 Mo. App. 328; Sec. 7585, R. S. 1919. (2) Instruction 1 was a general instruction covering the whole case, and did not single out or emphasize any special part of the evidence, particularly any disputed, material or harmful part. Bertram v. Peoples Ry. Co., 154 Mo. 639.; Weaver v. Rudasill, 172 Mo. App. 33; Jackson v. Ry. Co., 157 Mo. 645; Merriwether v. Publishers, 224 Mo. 629; Gardner v. St. Ry. Co., 167 Mo. App. 611. (3) Instruction 1 was not confusing in using the words "possible or practicable." The word "possible" as used in the city ordinance and the word "practicable" as used in the Motor Vehicle Law of 1921 are the same in meaning. At any rate, plaintiff was entitled to instruct on the ordinance ("possible") and defendant was not harmed by connecting the less-requiring word "practicable" to the harsher word "possible." (4) The verdict is not excessive. It is modest in view of plaintiff's serious, painful and permanent injuries. Salmons v. Railroad, 271 Mo. 395; Martin v. Kline, 249 Mo. 965; Bolton v. Ry. Co., 172 Mo. 92; Setzler v. Railroad, 227 Mo. 454.

SEDDON, C.—Action to recover damages for alleged personal injuries occasioned by a collision between an automobile, owned and driven by defendant, and plaintiff, near the intersection of Lafayette Avenue and Dolman Street in the city of St. Louis, about 8:15 P. M. on March 14, 1922. Lafayette Avenue is an east-and-west street and Dolman Street is a north-and-south street. It is admitted by the respective parties that both are public streets in St. Louis. There is a double-track street-car line on Lafayette Avenue, the tracks being located approximately in the center of the roadway. Lafayette Avenue is paved with asphalt. A plat in evidence shows the distance between the south rail of the south-car track (used by east-bound street cars) and the south curb-line of Lafayette Avenue to be thirty-two feet. The established and regularly-used stopping-point for east-bound street cars is a point on Lafayette Avenue

opposite an iron pole located at the south curb-line 64.5 feet west of the west curb-line of Dolman Street. The iron pole is marked with a yellow band, denoting the point of stoppage of the street cars. Plaintiff was a man fifty-six years of age at the time of his injury. His evidence tends to show that on the evening of March 14, 1922, accompanied by his niece, Miss Angeline Lauck, a Mr. Carl and a Miss Maag, he visited a sick brother at the City Hospital some two blocks east of the *locus in quo.* Shortly after eight o'clock, the four persons left the hospital and walked two blocks west on the north side of Lafayette Avenue to near West Dolman Street, where they crossed over from the north side of Lafayette Avenue and walked southwardly across the car tracks, intending to board an east-bound Bellefontaine car. Plaintiff was slightly in advance of his three companions, and, seeing a street car approaching from the west, he signaled the car to stop, the street car slowed down and stopped when plaintiff had reached, or had about reached, the usual stopping-place north of the painted iron pole, and the conductor threw the door open to permit the passengers to board the rear platform. Plaintiff then discovered the car was a Tower Grove instead of a Bellefontaine line car, whereupon he motioned the conductor to proceed. While plaintiff was three or four feet south of the east-bound car track and opposite the pole denoting the street car stopping place, and almost instantly after plaintiff had given the conductor the signal to proceed, plaintiff was struck by defendant's east-bound automobile, knocked down, dragged and run over. He was taken from under the automobile, driven by defendant to the home of a physician, where first-aid treatment was administered, and then taken by defendant to plaintiff's home. There had been some rain during the twenty-four hours preceding the time of plaintiff's injury, but plaintiff's witnesses testified that it was not raining at the time and that the street was dry at the time and place in question. There is a city street light at the southwest corner of the street intersection, which

was lighted at the time. The evidence of plaintiff's witnesses tended to show that defendant's automobile was traveling at the rate of twenty miles per hour at the time of the collision with plaintiff and that plaintiff was dragged a distance of eighty feet before the automobile was stopped. The point where the automobile finally stopped and plaintiff was taken from beneath, was fixed as being very near a physical object, a sewer valve, identified by the witnesses as being located in the intersection of the two streets ten feet east of the west curbline of Dolman Street and 10.5 feet north of the south curb-line of Lafayette Avenue. The sewer valve, as shown by the plat in evidence, is located 74.5 feet east of the regular street car stopping-point. Defendant's automobile stopped with its forepart headed or pointed north in Dolman Street. Plaintiff and his companions all testified that they heard no horn or other warning signal given by defendant's automobile at the time, or prior to the collision. Plaintiff testified that, when he stepped across the tracks, he looked and listened for the approach of automobiles from the west, but did not see any automobile coming from the west. The street car had started, but had not passed plaintiff, when he was struck. Testimony was adduced that a Ford truck, similar to defendant's automobile, could be stopped on a dry street with the grade of Lafayette Avenue in mind with safety while running twenty miles per hour within ten to fifteen feet, and if traveling ten miles per hour could be stopped within seven to nine feet.

Plaintiff pleaded and proved three general ordinances of the city of St. Louis effective at the time. One provides: "Drivers of motor vehicles of all kinds shall, when approaching a crossing . . . on a public street, sound their signals in such a way as to give a warning to other vehicles and to pedestrians of their approach." Another provides: "No automobile, motor vehicle, . . . shall be moved or propelled along, over or upon any public street, avenue, boulevard or other public place, so as to endanger the life or limb of

any person or the safety of any property, and shall not in any event, while upon any such street, avenue, boulevard, or public place, be moved or propelled at a greater rate of speed than eight miles per hour in the business portions of the city, and not greater than ten miles per hour on the other portions thereof.'' Another provides: ''A vehicle, except when passing a vehicle ahead, shall keep as near the right-hand curb as possible.''

Defendant testified in his own behalf: ''It rained when I left. The surface of Lafayette Avenue was wet. I was going east on the right-hand side. After I crossed Eighteenth Street the right-hand wheels of my automobile were about ten or twelve feet from the south curb. As I approached Dolman Street I was about the same distance from the curb. As I approached, coming down towards Dolman Street, I saw people in the street close by, or to the south of the east-bound car track. At that time a street car was near Dolman Street. As I approached I saw a man walking directly southeast. When I first saw him he was about twenty-five feet from the south rail of the east-bound car track. About twenty-five feet from the curbstone, out in the street I mean. From the car track I should judge about seven feet; between six and seven feet. He was six or seven feet, and he was walking southeast. At that time I was about sixty or seventy feet away from him. I sounded my horn the minute I saw him; between about sixty or seventy feet, I sounded my horn. And my machine continued on. When I realized Mr. Lauck wasn't going to stop I was about four or five feet away from him. I stopped and applied my brake. The condition of the street was wet. When I applied the brake and stopped, the rear end of my car turned, skidded from putting on the brake. The machine came in contact with Mr. Lauck. After I struck him it moved about four or five feet. Mr. Lauck said it was an unavoidable accident and it was as much his fault as it was my fault, and he thought there was no use of having me arrested. That conversation was at his home that evening, in the presence of his wife and

his family.'' Cross-examination: ''When I first saw Mr. Lauck wasn't going to stop, I threw my machine in neutral—I coasted. Gradually I put on my brakes as I coasted. When I saw he wasn't going to stop I slacked up; I applied my brake. I saw he was in a distance of about around sixty or seventy feet. I didn't know if he was going to stop or not, as I gave him the horn. It was at no crossing.· When I saw he wasn't going to stop, I was about four or five feet away from him. Just as soon as I saw that I put on the brakes. After I hit Mr. Lauck I skidded about four or five feet, after I hit him. I went a distance of about eight or ten feet after I applied my brake; I did not have any speedometer on my car. I was going to a friend's house. I did not exactly have an engagement, just going down to see him and spend the evening. I wasn't in any hurry, because I was all alone. It was not raining at that time; not at the time of the accident. When the accident occurred, the right-hand side of my car was about ten or twelve feet from the curb on Lafayette Avenue. Nor more than twelve; I am absolutely sure of that. I was going about twelve miles an hour; it might not have been more than that. I was driving very slow. I don't know the exact speed. When Mr. Lauck was walking southwardly· he appeared to be looking east. ·That would be down the street. He was walking southeast. He had his head down. He did not appear to know that any machine was near or approaching. I saw the other three people with Mr. Lauck in the street. They were standing right there at the time of the accident, right in the car track; they were there when I ran into Mr. Lauck. None of them were anywhere near the south curb that I saw at any time before I ran into and injured Mr. Lauck. They were out near the car line. I did not see a street car stop. After the accident, I saw the street car stop, but not before that. It stopped right at the crossing there; by crossing I mean Dolman Street; at the regular place. I passed south of the other three people in the street with my machine about fifteen feet from them. I did not

have any difficulty in seeing anybody in the street there that evening. It was light and a street light on the corner. I stopped my car a distance of about eight or ten feet, I suppose. I didn't measure that distance just exactly what it was, but according to the speed I was going and about the distance I would be before I approached Mr. Lauck, I saw he was in danger, and I stopped my car, and about the distance after I had the car and I stopped, I suppose it was a distance of about eight or ten feet. I did not pass any vehicle ahead at the time I hit Mr. Lauck. There was no other vehicle there. There was nothing to prevent me from being over at the right-hand curb at that point, along there. There was no safety zone there at that time. Mr. Lauck was dragged in the street about four or five feet. I met one of Mr. Lauck's sons, but I don't remember which one it was. I remember talking to one of the boys in the street. I did not tell him that I had an engagement and I was in a hurry and was speeding it up. I didn't tell him that I was trying to beat the street car, or that it was evidently my fault. I didn't tell Mr. James Lauck that in the house afterwards in the presence of the family. I wasn't in a hurry. I didn't say at that time to Mr. James Lauck that I was trying to beat the street car before it stopped. I had lights on the automobile. They were the usual and normal type of light and reflected out in front.''

One of plaintiff's sons testified in rebuttal that, when defendant brought plaintiff home, defendant said to plaintiff's son: ''I was going down—I was late, I had an engagement. I thought I could beat the street car before the passengers got on or off.'' Another son testified: ''He said he was going—he was in a hurry and he had an engagement that night and he was in a hurry and he tried to pull around the street car and run into Mr. Lauck, and he says, 'Mr. Lauck was about four feet west of the other parties.' The rest of the party. He said he hadn't seen Mr. Lauck until he got right up on top of him, and he said it was too late then to try to stop, and

310 Mo. Sup.—13.

he says evidently it was his own fault that he hit Mr. Lauck.''

Plaintiff's petition charges defendant with negligence in these respects: (1) that, before plaintiff could reach a place of safety in said street, defendant negligently and carelessly operated and ran his automobile eastwardly from behind said street car far out in Lafayette Avenue and away from the right-hand curb thereof, and failed to stop or slow up the automobile for said street car or intersecting street, and negligently ran same at a high, dangerous and unlawful rate of speed, and negligently failed to give any signal or warning of his approach, and negligently failed to keep a watch for plaintiff and others in said street, or to exercise care to discover them in said street; (2) that defendant negligently and carelessly failed to give any signal or warning of the approach of said automobile, or to give a signal in such way as to be a warning to plaintiff and others, contrary to the laws of Missouri and a certain pleaded ordinance of St. Louis; (3) that defendant, though not passing a vehicle ahead at said time, negligently failed to keep said automobile as close to or near the right-hand side, or right curb, as practicable or possible, contrary to the Missouri statute and a certain pleaded ordinance of St. Louis; (4) that defendant negligently failed at said time to drive said automobile in a careful and prudent manner and to exercise the highest degree of care, and at a rate of speed so as not to endanger plaintiff's life and limb and the lives and limbs of others, contrary to the Missouri statute and the ordinances of St. Louis then in force and effect, and negligently and carelessly operated said automobile at said time upon a public street near and at an intersecting street at a greater rate of speed than was reasonable, having regard to the traffic and use of said streets; (5) that defendant negligently propelled said automobile at a greater rate of speed than eight miles per hour through a business portion of said city and at a greater rate of speed than ten miles per hour, contrary to the laws of

Missouri and a pleaded ordinance of St. Louis; (6) that defendant negligently failed to keep a vigilant or careful watch for plaintiff and others in said street, failed to use even ordinary care to see or discover plaintiff and others in the street, and failed to have said automobile under such control that defendant could readily stop the same; and (7) negligence under the humanitarian rule or doctrine. Another charge of negligence in the petition was withdrawn by the trial court from the consideration of the jury. The answer is a general denial. The cause was submitted to a jury, resulting in a verdict and judgment in favor of plaintiff for $8,500. After unsuccessfully seeking a new trial, defendant appeals to this court.

I. Appellant assigns error in the refusal of his demurrers to the evidence, offered both at the close of plaintiff's case and at the close of all the evidence, asserting that the evidence clearly shows plaintiff to have been guilty of contributory negligence as a matter of law. Allowing to plaintiff every reasonable inference and intendment, we cannot say that plaintiff's own evidence convicts him of contributory negligence as a matter of law. In ruling this assignment, we must allow to plaintiff every reasonable inference which a jury might draw from all the facts and circumstances in the case. [Kuhlman v. Water, Light and Transit Co., 271 S. W. l. c. 795, and cases there cited.] Unless plaintiff's own testimony convicts him of contributory negligence as a matter of law, defendant is precluded from proving contributory negligence, for that is an affirmative defense and ordinarily must be charged in the answer. [George v. Railroad Co., 225 Mo. l. c. 413; Jewell v. Bolt & Nut Co., 231 Mo. l. c. 200.] Defendant's answer is a general denial. The assignment is ruled against appellant.

*Contributory Negligence.*

II. Appellant assigns error in the giving of plaintiff's Instruction 1, which charged the jury that "it was

the duty of any one operating an automobile on the public streets in St. Louis in March, 1922, to exercise the highest degree of care to avoid injury, and to run same in a careful and prudent manner and at a rate of speed so as not to endanger the life and limb of any person." This part of the instruction is founded upon the duties laid upon every person operating a motor vehicle by Section 19 of the Motor Vehicle Act, approved July 30, 1921, passed by the General Assembly in extra session convened on call of the Governor to meet at twelve o'clock M. on June 14, 1921. [Laws 1921, 1st Ex. Session, pages 76 to 107, inclusive.] The act, except certain sections thereof, became effective on November 2, 1921. By Section 1 of that act, all of Chapter 71, Revised Statutes 1919, entitled "Motor Vehicles," was repealed and a new chapter, embodied in the act, was enacted in lieu thereof. Appellant asserts that the act is unconstitutional and void because it is violative of Article IV, Section 55, and Article V, Section 9, of the Constitution of Missouri. Article IV, Section 55, of our Constitution provides: "The General Assembly shall have no power, when convened in extra session by the Governor, to act upon subjects other than those specially designated in the proclamation by which the session is called, or recommended by special message to its consideration by the Governor after it shall have been convened." Article V, Section 9, of the State Constitution provides: "The Governor shall, from time to time, give to the General Assembly information relative to the state of the government, and shall recommend to its consideration such measures as he shall deem necessary and expedient. On extraordinary occasions he may convene the General Assembly by proclamation, wherein he shall state specifically each matter concerning which the action of that body is deemed necessary."

In approaching the constitutional question thus raised, we must necessarily have in mind the well-recognized rule in this State that no enactment of the General

Assembly should be pronounced unconstitutional unless very clearly so, and in ruling the question every fair and reasonable intendment should be made to sustain the constitutionality of the legislative enactment. On the other hand, however, it is equally our duty to uphold the supremacy of the fundamental and organic law of the State, and, if it is clear to our minds that there is any conflict with, or violation of, the organic and fundamental law as expressed in the Constitution, we must so declare it. [Wells v. Mo. Pac. Ry. Co., 110 Mo. 1. c. 294.]

The Fifty-first General Assembly was convened in extra session at noon on June 14, 1921, by proclamation of the Governor, dated May 31, 1921, "to consider and enact such legislation as may to the General Assembly seem proper concerning the following subjects and purposes: . . . 4. Road legislation generally. . . . 7. Such other matters and subjects as may be recommended by the Governor by special message to the special session of the General Assembly for its consideration after it shall have been convened." [Senate Journal, 51st General Assembly, vol. 2, page 1199; House Journal, vol. 2, page 1535.] We do not, however, find it necessary to determine or rule herein whether the General Assembly in extra session had power to enact the act in question under and by virtue of the Governor's proclamation, for on June 22, 1921, the Governor sent to both branches of the General Assembly a special message recommending to its consideration certain subjects therein mentioned, and if the subject-matter of the legislative act in question is germane to or falls within any subject so recommended to the General Assembly in the Governor's special message then the act does not contravene the sections of the Constitution above referred to.

On June 22, 1921, the said special message was received by the Senate from the Governor, addressed "To the Senate of the Special Session of the 51st General Assembly of Missouri." Included therein is the following paragraph: "The subject of *regulating* or licensing *motor vehicles,* and fixing the amount and man-

ner of collecting such registration or license fees, is probably germane to that part of the call for this session which submits the road legislation. Nevertheless, you may desire to call upon motor licenses as a means of producing a maintenance fund for the roads to be constructed and *in order that there may be no doubt about it I submit this subject also.*" (Italics are ours.) [Senate Journal, 51st General Assembly, vol. 2, page 1221 et seq.] The same message was received from the Governor by the House, addressed: "To the House of Representatives of the Special Session of the 51st General Assembly of Missouri." [House Journal, vol. 2, page 1557; Appendix, House and Senate Journals, vol. 1.] While the special message of the Governor is addressed to the respective branches of the General Assembly rather than to the General Assembly itself as a constitutional branch of the government, it was none the less a message to the General Assembly within the meaning of our Constitution. [State ex rel. Rice v. Edwards, 241 S. W. 947.] It was also a "recommendation" by the Governor to the consideration of the General Assembly of the subjects embraced therein. [Ex parte Seward, 299 Mo. 385.] This court will take judicial notice of the official proclamations and messages of the Governor. [Wells v. Missouri Pac. Ry. Co., 110 Mo. l. c. 293.]

This much having been said regarding the purpose and effect of the special message of the Governor, let us proceed to analyze the particular paragraph of that message above referred to with the purpose of determining whether it conferred power upon the General Assembly in extra session to enact the Motor Vehicle Act now in question. The first sentence of the paragraph clearly indicates that it deals with "the subject of regulating or licensing motor vehicles" and the Governor expresses therein his belief that the *subject* "is probably germane to that part of the call (or proclamation) for this session which submits the road legislation." The message then proceeds in the second sentence of the paragraph: "Nevertheless, you may desire to call upon mo-

tor licenses as a means of producing a maintenance fund for the roads to be constructed and in order that there may be no doubt about it I submit *this subject* also." It is evident to our minds that, while the Governor believed the subject of *regulating* motor vehicles is probably germane to that part of his proclamation calling the General Assembly in extra session which submits the subject of road legislation, nevertheless there might be some doubt about the matter. Hence, in order that there may be no doubt about it, he submits *"this subject* (i. e., *regulating* or licensing motor vehicles) also." The *subject* referred to in the immediately preceding sentence of the paragraph is *regulating* or licensing motor vehicles and the words *"this subject"* used in the following sentence of the paragraph can only refer to the *subject* expressed and stated in the preceding sentence, for that is the only subject *referred* to or spoken of in the paragraph. The word "subject" is used but twice in the entire paragraph; the first sentence specifically names or states the *subject* which the Governor had in mind and of which he speaks as "the subject of *regulating* or licensing motor vehicles;" the following sentence refers back to "this subject," which the Governor submits, or recommends, to the consideration of the General Assembly.

The word or term "regulating" is broader in its scope and meaning than the word "licensing." The word "regulate" is defined, "to adjust or contend by rule, method, or established mode; govern by or subject to certain rules or restrictions; to direct by rule or restriction; to subject to governing principles or laws." [Webster's New International Dictionary; Century Dictionary.] The word "license" is defined, "to permit or authorize; to give permission; to grant authority to do an act which, without such authority, would be illegal or inadmissable." [Webster's and Century Dictionaries.] The power to regulate may include the power to license, but the power to license does not embrace the power to regulate. The distinction is clearly and succintly ex-

pressed in Pacific University v. Johnson, 47 Ore. 448, 84 Pac. 704, 706, wherein the Supreme Court of Oregon said: "To license is one thing and to regulate another. To license means to permit, to give authority to conduct and carry on; while to regulate means to prescribe the manner in which a thing licensed may be conducted."

It is clearly evident, we think, that had the Governor intended to submit the subject of "licensing" motor vehicles alone to the General Assembly in extra session for its consideration, he would then have omitted entirely from his special message the broader and more expansive word "regulating." On the contrary, the broader and more expansive word "regulating" is used first by the Governor in the clause expressing the specific subject recommended and submitted by his special message, denoting to our minds the fact that the Governor intended to submit not only the mere subject of "licensing," but the broader and more comprehensive subject of "regulating" motor vehicles as well. One of the well-recognized canons of statutory construction is that words in common use must be given their natural, plain and ordinary signification and meaning. Another well-settled rule is that, so long as the language used is unambiguous, a departure from its natural and ordinary meaning is not justified by any consideration of its consequences or of public policy, and it is the plain duty of the courts to give it force and effect. [State ex rel. v. Wilder, 206 Mo. 541.] Another cardinal rule in the construction of statutes is that effect is to be given, if possible, to every word, clause and sentence. [36 Cyc. 1128; State ex rel. v. Harter, 188 Mo. l. c. 529.]

From what we have here said, we arrive at the conclusion that the subject of regulating motor vehicles was recommended and submitted to the consideration of the General Assembly by the Governor's message. It therefore follows that the General Assembly convened in extra session had the power to enact the Motor Vehicle Act in question, the subject-matter of that act being germane to the subject submitted, the regulating of mo-

tor vehicles, and the act in question is not violative of the Constitutional inhibitions invoked by appellant. The giving of plaintiff's Instruction 1, insofar as it charged the jury respecting the duties laid upon the operator of an automobile by the Motor Vehicle Act, was not error and the assignment must be ruled against appellant.

III. It is urged that plaintiff's Instruction 1 is erroneous in that it declares to the jury that "if you find from the evidence that plaintiff on March 14, 1922, was in Lafayette Avenue, near the east-bound street-car track and near Dolman Street, for the purpose of boarding an east-bound street car at that point" and defendant was guilty of the acts of negligence submitted, then plaintiff is entitled to recover his damages. It is said that the quoted part of the instruction is a comment on the evidence and emphasizes the fact that plaintiff was near the east-bound street-car track for the purpose of boarding a car, to the prejudice of defendant. It was not controverted by defendant's evidence that plaintiff was injured near the east-bound street-car track, nor that he was at that point for the purpose of boarding a street car. Hence, that fact was immaterial to the issues involved and defendant suffered no prejudice by reason of the criticised portion of the instruction. [Bertram v. Railway Co., 154 Mo. 639; Jackson v. Railroad, 157 Mo. 621.] We rule this assignment against appellant.

*Undue Comment.*

IV. It is claimed plaintiff's Instruction 1 is also erroneous in that it instructed the jury that it was the duty of an operator of an automobile to run or drive the same as near the right-hand side or curb of the street "as possible or practicable." Appellant claims the terms "possible" and "practicable" are contradictory and misleading. The Motor Vehicle Act (Sec. 21, Laws 1921, 1st Ex. Sess. p. 93) uses the term "practicable," while the ordinance of the city of St. Louis in evidence uses the term "possible." We

*Possible or Practicable.*

cannot view the contention of appellant with seriousness, inasmuch as lexicographers recognize the two words as synonyms. [Webster's International Dictionary; Century Dictionary.]

V. It is said plaintiff's Instruction 1 is in conflict with defendant's given Instruction 2. Defendant's Instruction 2 withdrew from the consideration of the jury one of the charges of negligence pleaded in the petition. Plaintiff's Instruction 1 as originally submitted to the trial court included that charge, but the court modified plaintiff's instruction before giving the same by striking the charge therefrom. Hence, there is no conflict in the two instructions as given to the jury.

**Conflict.**

VI. It is claimed that the trial court erred in refusing defendant's Instruction 7, which would have withdrawn from the jury the issue that defendant failed to give plaintiff any signal or warning of the approach of the automobile. While defendant testified that he sounded the horn of his automobile when approaching plaintiff, plaintiff and his witnesses all testified unequivocally that they heard no horn or other warning signal at the time. The evidence on that issue is clearly conflicting, and the trial court properly submitted the issue as one of fact to be determined by the jury.

**Signal Warning.**

It is also claimed that the trial court erred in submitting the case to the jury on defendant's alleged violation of the St. Louis ordinances limiting the speed of an automobile to ten miles per hour and requiring that a vehicle, except when passing a vehicle ahead, shall keep as near the right-hand curb as possible. Defendant, upon his own testimony, convicted himself of a violation of both ordinances, for he testified that he was traveling at about twelve miles per hour and that there was no vehicle ahead and there was nothing to prevent him from "being

**Speed: Keeping Near Curb.**

over at the right-hand curb at that point, along there.''
The assignments are ruled against appellant.

VIII.   Lastly, appellant urges that the verdict is
excessive and was the result of passion and prejudice on
the part of the jury.   We do not regard the verdict of
$8,500 as excessive.   According to plaintiff's testimony
and that of several physicians who have treated or ex-
**Excessive** amined him, his injuries were serious, painful
**Verdict.** and permanent.   He sustained a concussion of
the brain, severe burns and a fracture of
the fibula of the right leg, and various bruises and abrasions
about the hips, chest and abdomen.   The sacroiliac joints
were wrenched and his back, spine and neck were severe-
ly twisted and wrenched.   The physicians found evidences
of spondylitis, or inflammation or roughening of the
edges of the bone, in the region of the pelvis, the sacroil-
iac and the lumbar spine, and the spinal vertebrae ap-
peared to be ankylosed in places.   Plaintiff was confined
to bed for eight weeks, walked on two crutches for five
months, after which he used one crutch for four months,
and was using a cane at the time of the trial, more than a
year after the injury.   While he had theretofore been a
strong, robust man engaged at hard labor* in lifting,
heavy burdens, Dr. Vitt, a physician appointed by the
court, testified as a witness for defendant that, ''I thought
the plaintiff in this case considerably invalided, and so
stated in my report.   I don't think he will be able to en-
gage in work that would require considerable activity
and movement and stooping over and lifting or walking
a great deal.   I don't think he ever will be able to do that
again.''   There was no untoward or unusual circum-
stance occurring at the trial to incite the passion or
prejudice of the jury.

A careful examination of the record on our part dis-
closes no reversible error.   The judgment should be af-
firmed, and it is so ordered.   *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON,
C., is adopted as the opinion of the court.   *Ragland, P.
J., Graves* and *Atwood, JJ.,* concur.