[No. 32478.   *En Banc.*   May 7, 1953.]

THE STATE OF WASHINGTON, *on the Relation of William J. Pennock, Plaintiff,* v. EARL COE, *as Secretary of State, Respondent.*[1]

[1]Reported in 257 P. (2d) 190.

*Sarah H. Lesser,* for relator.

*The Attorney General, E. P. Donnelly* and *Moksha Smith, Assistants,* for respondent.

DONWORTH, J.—This is an original proceeding in mandamus to compel the secretary of state to accept for filing the necessary documents tendered by relator for the referendum of §§ 7 and 36 of chapter 174, Laws of 1953, pp. 346, 367.

Relator in his application for the writ alleges full compliance with the statutory and constitutional requirements to entitle his committee of legal voters to seek such referendum, and that respondent refused to accept for filing the documents tendered because chapter 174 contained an emergency clause which provided it should take effect April 1, 1953.

Relator then asserts:

" . . . that by reason of such refusal, relator and the people of the State of Washington, are, and will be, deprived of the constitutional right reserved to the people of Washington to pass upon said sections of said bill at the next suc-

ceeding general election following the passage of such bill by the legislature."

The final paragraph of relator's application reads:

"That neither Sec. 7 & 36 of said Substitute Bill No. 225 [Chap. 174], nor any part of the aforesaid Bill, on which relator and said committee desires to order the referendum are necessary for the immediate preservation of the peace, health or safety of the state, nor for the support of the state government and its existing institutions and that the refusal of the respondent, Secretary of State, to allow such referendum was and is wrongful, arbitrary, capricious and contrary to the Constitution and the laws of the State of Washington made and provided for such cases."

Respondent has filed herein both a motion to dismiss and an answer. The motion is based on two grounds: (a) that relator's application does not contain facts sufficient to entitle him to any relief, and (b) that relator is estopped from invoking the original jurisdiction of this court. Respondent's answer admits the material allegations of the application but denies certain legal conclusions.

The usual alternative writ having been issued, the cause was argued before Department Two of this court and again before the entire court sitting *En Banc*.

With regard to the first ground stated in respondent's motion to dismiss, this is in substance a demurrer to the application, which raises the legal issues hereinafter disposed of.

The second ground is supported by an affidavit of the acting director of the department of public assistance which states that the appropriation necessary to authorize the disbursement of funds for the care of the needy under chapter 174 is found in chapter 3, Laws of 1953, Ex. Ses., p. 5. It is further stated that, in compliance with these acts, affiant performed all duties required thereby to make it possible for their operation to commence on April 1, 1953, as required by the legislature, and that he had no notice prior to the institution of this proceeding on March 30, 1953, that the effective date of any portion of these acts would be challenged. Affiant stated that many applications for assistance

have been made and are being processed pursuant to the provisions of chapter 174 and chapter 3, above mentioned.

■ The statements made in this affidavit are not sufficient to support respondent's ground (b) of his motion to dismiss this proceeding on the theory of estoppel because of undue delay. Chapter 174 was signed by the governor March 18, 1953, and chapter 3 (referred to in the affidavit) was signed March 25, 1953. The delay of a few days between these dates and March 30, 1953, when this proceeding was instituted, is insufficient to create an estoppel, and respondent's motion to dismiss on that ground is denied.

The constitutional provision which we are called upon to interpret in this case is the following portion of paragraph (b) of the seventh amendment:

"The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted."

We now come to the difficult legal question which has been before this court many times since the seventh amendment to the constitution was adopted by the people in 1912, to wit: Under what circumstances is the legislature's declaration of emergency to be held valid with the result that the right of referendum which the people reserved in that amendment is thereby cut off?

We do not attempt here to reconcile several inconsistent statements of the rules of law applicable thereto stated in our prior decisions.

Although we do not agree with the statement in *State ex rel. Robinson v. Reeves,* 17 Wn. (2d) 210, 135 P. (2d) 75, 146 A. L. R. 280, that this court has "very consistently and clearly (except in one instance) marked the cleavage" between emergency acts subject to referendum and those not subject thereto, we begin our consideration of this problem by quoting rather extensively from that decision, be-

cause it contains an excellent summary of the state of the law in 1943. In that case we said:

"So, as it finally resolves itself, the question is whether this act is necessary for the *immediate* preservation of the public peace, health, and safety, and support of the state government and its *existing* public institutions.

"In approaching this question, we must, of course, give great weight to the legislative declaration of emergency. Acts excepted from the referendum fall into two categories: (1) those in exercise of the police power; and (2) those providing for the financial support of the state and its *existing* institutions. If, upon any fair inference, this act may be said to fall in either category, it is not, by reason of the declaration of emergency, subject to the referendum; otherwise, it is.

"In its decisions, this court has very consistently and clearly (except in one instance) marked the cleavage between acts which are and those which are not subject to the referendum. It has upheld legislative declarations of emergency where the acts could, by reasonable inference, be said to be an exercise of the police power or in financial support of the state government or its existing institutions: *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 Pac. 28, relating to the construction of highways; *State ex rel. Case v. Howell,* 85 Wash. 281, 147 Pac. 1162, relating to the financing of local improvement districts (which, of course, include sewer districts); *State ex rel. Case v. Howell,* 85 Wash. 294, 147 Pac. 1159, relating to the regulation of common carriers on the streets and highways; *State ex rel. Anderson v. Howell,* 106 Wash. 542, 181 Pac. 37, motor vehicle code; *State ex rel. Hamilton v. Martin,* 173 Wash. 249, 23 P. (2d) 1, relating to the issuance of state obligations in order to alleviate conditions of want and distress caused by widespread unemployment; and *State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 297 Pac. 1071, relating to excise taxes on butter substitutes. Obviously, the acts under consideration in these cases were in exercise of the police power or in support of the state government and its existing institutions. In some instances, they fall in both categories; consequently, it was held they were not subject to referendum.

"On the other hand, where acts could not, by any fair inference, be said to be in exercise of the police power nor in support of the state government and its existing public institutions, the court has held legislative declarations of emergency abortive. *State ex rel. Brislawn v. Meath,* 84

Wash. 302, 147 Pac. 11, relating to a change of the personnel of the board of state land commissioners; *State ex rel. Mullen v. Howell*, 107 Wash. 167, 181 Pac. 920, relating to the prohibition amendment; *State ex rel. Satterthwaite v. Hinkle*, 152 Wash. 221, 277 Pac. 837, relating to the substitution of a director of highways for the department of highways; and *State ex rel. Burt v. Hutchinson*, 173 Wash. 72, 21 P. (2d) 514, relating to horse racing and betting by the pari-mutuel system. The acts under consideration in this group of cases, falling in neither category, were held subject to the referendum.

"The exception in the course of the court's decisions heretofore noted is found in the case of *State ex rel. Short v. Hinkle*, 116 Wash. 1, 198 Pac. 535. That case involved the administrative code. Notwithstanding that what was effected by that code was only a change in the state administrative agencies, the court upheld a legislative declaration of emergency. The decision is not in harmony with the principles upon which all the other cases we have referred to were decided and is in direct conflict with the decisions in *State ex rel. Brislawn v. Meath, supra*, and *State ex rel. Satterthwaite v. Hinkle, supra*. It should therefore be overruled."

In the *Robinson* case, the emergency declaration involved was held to be invalid because the act to which it was attached related to a long-range program for the acquisition of private power plants by public utility districts if and when they might elect to proceed thereunder. The act was correctly held not to come within the exception contained in paragraph (b) of the seventh amendment.

Two years later, this court held in each of two cases that the emergency declaration in each act under consideration was not valid as against an attempted referendum.

*State ex rel. McLeod v. Reeves*, 22 Wn. (2d) 672, 157 P. (2d) 718, involved an act to change the method of appointment and removal, and tenure of office, of commissioners under the state game code. The amendatory act was held to be subject to referendum under paragraph (b) of the seventh amendment. A similar result was reached in *State ex rel. Kennedy v. Reeves*, 22 Wn. (2d) 677, 157 P. (2d) 721, in reference to an act providing for unification of control and jurisdiction over the sale, reforestation, and administra-

tion of state timber. Again this court sustained the right of referendum.

The decision most nearly resembling the present case is *State ex rel. Pennock v. Reeves*, 27 Wn. (2d) 739, 179 P. (2d) 961, where two welfare acts were involved. There, as here, relator sought to subject *parts* of the acts to referendum and not the whole thereof. The case was decided by a divided court. The majority opinion (signed by four judges with two others concurring in the result) disposed of the case by holding that a partial referendum may not be had with respect to a law which admittedly contains emergent matter. The majority opinion stated the following rule:

"In each case, the relator seeks a referendum, not on the entire act, but on all portions of each act except the words actually making an appropriation and except the emergency declaration. The language of chapter 289 which relator proposes shall be unaffected by the referendum constitutes an entire sentence, but in chapter 288 the language relative to an appropriation constitutes only a portion of a sentence.

"Relator concedes that the section of each statute providing for an appropriation is emergent, in that the appropriation is for the support of an existing state institution, but argues that the remainder of the two statutes is referable under the seventh amendment to the state constitution, which provides that the second power reserved by the people is the referendum,

" '. . . and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, . . .'

"Paragraph (b) of the seventh amendment to the constitution, after providing that any act, bill, law, or any part thereof passed by the legislature may be subject to referendum, reads as follows

" '. . . except such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, . . .'

"The framers of the seventh amendment to the state constitution advisedly use the language quoted above. The exception deals with a 'law' not a 'part' of a law, necessary for the immediate preservation of the public peace, support of existing state institutions, etc. It was not intended that an emergency could be picked to pieces. Each emergency measure, however urgent, may contain within its provisions

some sentences or clauses which could be picked out and, if examined separately, could be found not to be essential to the emergency purpose. No such result was intended by the framers of the seventh amendment to the constitution.

"The constitution authorizes referendum on a part of a law which is subject to referendum, but it does not contemplate a law partially subject to referendum and partially not subject to referendum. That is obvious from the above-quoted portion of paragraph (b) of the seventh amendment to the constitution.

"A partial referendum may not be had on a law which admittedly contains emergent matter. The appropriation in each act under consideration contains an appropriation for the support of an existing public institution, hence the section in each statute carrying an appropriation for existing institutions of the state government is not subject to referendum. The seventh amendment to the constitution contains no requirement that the legislature shall make a declaration of an emergency or that a measure is necessary for the support of the state government."

In so far as the majority opinion in that case holds that there can *never* be a referendum of *a part* of a law which obviously contains any emergent matter, it is hereby expressly overruled.

Nevertheless, we think that the following portion of the majority opinion in that case correctly states the rule by which we are guided in deciding the present case as well as cases involving the same problem which may come before us in the future:

"In each of the statutes in the cases at bar is a declaration that the act is necessary for the immediate preservation of the public peace, health, and safety. We have consistently held that such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P. (2d) 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption."

Applying this rule to the case at bar, we now consider the provisions of § 7 and § 36 of chapter 174, and shall determine from the face of the act and from matters of which we may take judicial notice whether the declaration of emergency in § 53 is valid under the exception stated in paragraph (b) of the seventh amendment hereinabove quoted.

Chapter 174 contains fifty-three sections and is almost entirely amendatory of previously existing laws relating to public assistance. It would unduly extend this opinion to attempt to state the substance of its provisions. It is entitled:

"An Act relating to public assistance; amending certain sections of chapter 43.17, 43.18, 74.04, 74.08, 74.10, 74.12, 74.16, RCW; adding new sections thereto; repealing certain sections of 43.18, 74.04, 74.08, 74.10, 74.12, 74.16, RCW; providing for a state assessment not in excess of two mills; containing an appropriation; and declaring an emergency."

Section 53 of the act declares an emergency as follows:

"This act is necessary for the immediate preservation of the public peace, health and safety, the support of the state government and its existing public institutions, and shall take effect April 1, 1953."

In considering this problem, we must have in mind the provisions of chapter 3, Laws of 1953, Ex. Ses., in which the legislature appropriated $150,000,000 out of the general fund to the department of public assistance for the biennium beginning April 1, 1953, for the purposes stated therein. In addition, $7,500,000 was appropriated for the payment of senior citizens' grants for the biennium. This act carried an emergency clause identical in wording with § 53 quoted above. Chapter 3 appropriated these sums for the purpose of enabling the department of public assistance to carry out the program described in chapter 174, Laws of 1953.

Since chapter 174 and chapter 3 are *in pari materia*, they must be considered together in discussing the legal question involved in this case. *State ex rel. Anderson v. Howell*, 106 Wash. 542, 181 Pac. 37.

Sections 7 and 36, which relator seeks to have referred to the voters at the November, 1954, general election, read as follows:

Sec. 7. "Section 74.04.060, RCW, as derived from section 5, chapter 128, Laws of 1941, as last amended by section 1, chapter 10, Laws of 1950, extraordinary session, is amended to read as follows:

"For the protection of applicants and recipients, the department and the county offices and their respective officers and employees are prohibited, except as hereinafter provided, from disclosing the contents of any records, files, papers and communications, except for purposes directly connected with the administration of the programs of this act. In any judicial proceeding, except such proceeding as is directly concerned with the administration of these programs, such records, files, papers and communications, and their contents, shall be deemed privileged communications *and except for the right of any individual to inquire of the office whether a named individual is a recipient of welfare assistance and such person shall be entitled to an affirmative or negative answer.*

"The county offices shall maintain monthly at their offices a report showing the names and addresses of all recipients in the county receiving public assistance under this act, together with the amount paid to each during the preceding month.

"The provisions of this section shall not apply to duly designated representatives of approved private welfare agencies, public officials, members of legislative interim committees and advisory committees when performing duties directly connected with the administration of this act, such as regulation and investigation directly connected therewith: *Provided, however,* That any information so obtained by such persons or groups shall be treated with such degree of confidentiality as is required by the Federal Social Security Law.

"It shall be unlawful, except as provided in this section, for any person, body, association, firm, corporation or other agency to solicit, publish, disclose, receive, make use of, or to authorize, knowingly permit, participate in or acquiesce in the use of any lists or names for commercial or political purposes of any nature. The violation of this section shall be a gross misdemeanor." (Italics ours.)

Sec. 36. "Chapter 74.08, RCW, shall have added thereto a new section to read as follows:

*"Upon the death of a person who has been a recipient of old age assistance the total amount paid under the provisions of this act shall be a debt due the state and a claim for said debt shall be filed in accordance with RCW 11.40.010, and as hereafter amended: Provided,* That if the heirs, devisees or legatees of any recipient of old age assistance shall demonstrate to the satisfaction of the probate court that they were financially unable to render him support during the period in which he was such a recipient, the amount paid under the provisions of this act shall not be a debt due the state, and said heirs, devisees or legatees shall take free of any such claim.

"Procedure for the allowance of such claims shall be in accordance with chapter 11.40, RCW, and as hereafter amended, and shall be subject to chapter 11.52, RCW, and as hereafter amended.

"The claim of the state shall have preference to the claims of all unsecured creditors, except funeral expenses, expenses of last sickness and of administration.

"Such claims shall not be enforced against any real estate while it is occupied by the surviving spouse or dependent children of the recipient, unless it becomes necessary for the state to protect its position as against another creditor or creditors, but the statute of limitations shall be tolled as to the state and the time that the collection is prohibited under this section shall not be a part of the time limited for the commencement of action. *All recoveries under this act shall be distributed between the county, state and federal government, respectively, in the proportion they have contributed assistance to such recipient.*

"The provisions of this section shall also apply to any person or his estate receiving benefits of any public assistance which materially improved or benefited any real estate owned by the recipient while benefiting from public assistance under this act or at his death." (Italics ours.)

The purpose and intent of the legislature in enacting these two amendatory sections was to curb, or at least minimize, the possibility of serious abuses which had been experienced in the social welfare program, whereby those least deserving of public aid benefited at the expense of the deserving and at the expense of the state and its political subdivisions, without depriving qualified applicants and recipients of the assistance to which they were rightfully entitled.

We think that this is the only inference that can be drawn, in view of the fact that this was the avowed purpose of the people in enacting the senior citizens' public assistance act of 1950 of which chapter 174 is, in part, amendatory. See § 2, chapter 1, Laws of 1951, p. 3, which was discussed in *Senior Citizens League, Inc. v. Department of Social Security*, 38 Wn. (2d) 142, 159, 228 P. (2d) 478.

This purpose was sought to be accomplished by providing in § 7 and § 36 for certain publicity (both before and after death of the recipient) as to the identity of those persons who were or had been receiving public welfare assistance. Presumably, the effect of these provisions will be to minimize serious abuses in administering the act and to limit grants thereunder to qualified applicants and recipients who are rightfully entitled to them. From the face of chapter 174 and chapter 3, supplemented by facts of which we have judicial knowledge (and are referred to below), we feel warranted in indulging the presumption that the legislature entertained the opinion that the publicity provided for in these sections will tend to discourage those least deserving of public aid from applying for it or continuing to receive it. In this manner, the legislature was endeavoring to reduce the burden of the taxpayers of the state and its local subdivisions to support the welfare program as well as to make possible larger grants for those rightfully entitled to public assistance.

The problems confronting the legislature in 1951 and 1953 are described in the two messages delivered by the governor at the opening of the thirty-second and thirty-third legislatures, respectively. Since the governor is required by the constitution (Art. III, § 6) to report to the legislature at every session on the affairs of the state and recommend the passage of such measures as he deems expedient, we may take judicial notice thereof. 31 C. J. S. 606, § 41. *Carnley v. Brunson*, 227 Ala. 197, 149 So. 87; *Lauck v. Reis*, 310 Mo. 184, 274 S. W. 827.

Referring to the social security program and the financial difficulties connected therewith, the governor in his message to the legislature on January 10, 1951, stated:

"The present situation of our general fund is unprecedented, if not unexpected. The 1949 legislature appropriated $93,000,000 more than existing sources of revenue produce, and did not see fit to provide for additional sources to cover the balance. Through pre-audit, through the postponement of projects that seemed desirable but not essential, through economies, there will be reverted from the present general fund budget approximately $13,000,000—so that the next operating deficit of the current biennium will approximate $80,000,000.

"Social Security and Education accounted for 86 per cent of the general fund expenditures in the first nineteen months of the current biennium. This high percentage of expenditures for these two activities of government is completely out of line with what is expended in these categories by other states. It is a result of the assumption of responsibilities by the state government over a period of years that should properly be carried in a larger measure by local government. A recently published report by the U. S. Department of Commerce, Bureau of Census, on state government finances in 1949, placed Washington at the top of the list in per capita expenditures—when you combine the expenditures of schools and public welfare. Our per capita expenditure was $74.20. The average of all states was $32.06. The next highest per capita expenditure of any state in these combined categories was $64.89, or almost $10 per capita less than we spend in the State of Washington. Only nine states in the Union spent more than $40 per capita on these two functions of state government. It does not follow that these services are getting more money than they need, although in the case of welfare under Initiative 172 in 1949 that was undoutedly true. But it does mean that in a solution of our problem serious consideration must be given to ways and means of adjusting the responsibility for the raising of money for these purposes so that more of it can be collected by local government under their supervision, and tied in with the spending of the funds more directly.

"Our citizens approved in November, 1948, a vastly expanded public assistance program under Initiative 172 that required appropriations totaling $223,000,000 or roughly $76,000,000 more than in the previous biennium. The Department of Social Security tried its best to keep assistance payments under control and stop abuses but was hamstrung in its efforts by the overly generous provisions of the law and liberal interpretations of the Federal Security Agency. Throughout the biennium, our grants in all categories were

among the highest in the nation, as were our case loads. Federal matching funds were percentage-wise next to the lowest of all states because of the size of our grants. The Social Security program would have cost over $240,000,000 had Initiative 172 remained in effect for the next biennium. But the people realized that things had gone too far, and the program had to be brought into line with our ability to pay for it. They approved Initiative 178—giving all of us as public officials a clear mandate to hold the cost of welfare to a maximum of $175,000,000.

"The budget that the administration recommends to you carries a state appropriation of $148,000,000 for the Department of Social Security and $25,000,000 for the medical program now administered by the Department of Health—a total of $173,000,000. Both departments have taken the necessary steps to put the provisions of the law into effect without delay.

"Such substantial reductions in expenditures for welfare will involve a change in thinking about the benefits that people can derive from government. There is no question but that the people of the State of Washington want to meet the basic needs of those who really are entitled to help. The Department of Social Security will make every effort—with the funds available—to administer the program in such a way that those who really need assistance will get it. But a determined effort must and will be made to get into productive activity large numbers of people who, instead of being dependent upon public assistance, should be making their contribution to the well-being of this country. The need exists to use every kind of manpower that can contribute to the productive capacity of America.

"A number of requests for amendatory legislation will be made to you from the Department of Social Security and from the Legislative Council. It will be up to you, after you have reviewed these legislative suggestions, to strengthen and implement Initiative 178 as you feel conditions warrant."

On January 14, 1953, the governor again addressed the legislature on this subject and recommended as follows:

"In field of public assistance we have made substantial savings despite the growing problem that confronts us in some areas. We are developing a program of 'assistance based on genuine need.' Only in this way is it possible at the state level to care adequately for the worthy and deserving who are not sufficiently covered by Federal Old Age and

Survivors Insurance or by self-financing programs of a public or private nature. We feel that further savings in this field can be made, based on the current cost of living, without reducing the present grants to our aged for their essential needs.

"Other states finding themselves in circumstances similar to ours have enacted legislation making available to official bodies for official purposes welfare data regarding those receiving assistance. They have also enacted legislation authorizing the recovery of funds from the estates of the deceased recipients of public assistance. These steps have made more secure the financial assistance to the living who are in need. I commend these measures to you and will present legislation to effectuate them."

Following these recommendations, the thirty-third legislature enacted chapter 174 and included therein § 7 and § 36, which specifically carried out the governor's suggestions for improving the social welfare program by providing for limited publicity regarding recipients and thus minimizing abuses. In so doing, it must be presumed that the legislature investigated the governor's statement that similar measures in other states had produced more financial assistance for those in need without any increased cost to the taxpayer, and that the legislature acted on the information acquired by it.

It is not necessary to review all the various acts of the legislature and initiative measures relating to the various phases of public assistance which have from time to time been enacted, amended, and repealed during the eighteen years since the passage of chapter 182, Laws of 1935, p. 855 (the first law enacted providing for old-age assistance) in order to be persuaded that the public assistance program is an existing public institution. Even though the old-age pensions were held by this court not to be an "existing institution" in 1933 (*State ex rel. Burt v. Hutchinson*, 173 Wash. 72, 21 P. (2d) 514), there can be no doubt that in recent years public assistance has become the state's largest existing public institution from the standpoint of the amount of the appropriations necessary to maintain it.

Nor is this court concerned with the conflict which has

raged during the past eighteen years between groups of voters who have sought to have large sums expended by the state for social welfare and their opponents who have attempted to reduce the cost of that program. The merits of this political controversy is a matter of legislative policy. During this period, the appropriation for public assistance has increased from $10,000,000 in 1935-1937 to a peak of $223,000,000 in 1949-1951, and was reduced to $157,500,000 in 1953-1955.

There is still existing an accumulated deficit in the general fund, due to the operation of the department of social security in 1949-1951 under initiative No. 172, amounting to approximately $40,000,000. See report of the state treasurer as of January 31, 1953. We mention these matters merely as being part of the background which the legislature in 1953 was called upon to consider and act upon with reference to the problem of financing the social welfare program.

From the face of chapter 174 and chapter 3 and the matters above mentioned (of which we take judicial notice), we cannot say that the legislative declaration that chapter 174 is necessary for the support of the state government and its existing institutions is false, and, giving every reasonable presumption in favor thereof, we are compelled to hold that the declaration of the emergency contained in § 53 of the act is valid.

As was well said in *State ex rel. Reiter v. Hinkle,* 161 Wash. 652, 297 Pac. 1071, relating to an emergency section in an act levying an excise tax on the sale of butter substitutes:

"No facts of which we will take judicial notice are called to our attention which justify a holding that the emergency clause is a mere pretense, for which reason we should brush aside the solemn legislative declaration. Whether or not the act will produce a substantial revenue, or result in the discontinuance of the sale of the food stuffs subject thereto, cannot now be determined."

This language is applicable here. Chapter 174 is patently designed to reduce the cost of administering the public

assistance program, and all its sections are integral parts of the legislative plan designed to attain this result, which is essential to the emergency purpose of the act. The appropriation made in chapter 3, Laws of 1953, Ex. Ses., was based on the estimated savings in operating expenses which the legislature anticipated would result from the provisions of chapter 174. The two acts are geared to each other. No reasonable ground has been shown by relator for holding that the legislative declaration that such savings are necessary for the support of government and its existing public institutions should not be accorded every favorable presumption.

In view of what has been said, we do not find it necessary to pass upon the question of the validity of the legislative declaration in § 53 that the act is necessary for the immediate preservation of the public peace, health or safety. Under the provisions of paragraph (b) of the seventh amendment, it is sufficient to hold that these two sections are not referable under either one of the two exceptions specified therein. *State ex rel. Robinson v. Reeves, supra.* Having upheld the sufficiency of the legislative declaration that chapter 174 is necessary for the support of the state government and its existing public institutions, we need go no farther. See *State ex rel. Blakeslee v. Clausen,* 85 Wash. 260, 148 Pac. 28.

In reaching our decision in this case, we have not overlooked relator's contention that, since § 51 of the act contains a severability clause, chapter 174 must be severable for referendum purposes. We do not agree with this contention. The legislative purpose in inserting such a provision in any act is to take care of the contingency that a court might hold a part thereof to be unconstitutional. The effect of including the provision is to minimize a possibility of a holding that the entire act is invalid. *Jensen v. Henneford,* 185 Wash. 209, 53 P. (2d) 607. It is merely an aid to interpretation and is not binding upon the court in any event. 11 Am. Jur. 848, Constitutional Law, § 156.

We think that the expression of legislative intent con-

tained in § 51 relates solely to the contingency we have mentioned, and that it has no bearing upon our problem here.

During the oral argument, one further question was raised, to wit, whether, in view of the "ratable reduction" provision contained in the citizens public assistance act of 1950 (RCW 74.08.270), any deficit could arise in the administration of the public assistance program, and, therefore, chapter 174 and chapter 3, construed together, could be validly declared by the legislature to be necessary for the support of the state and its existing public institutions.

RCW 74.08.270 (which was not amended by chapter 174) reads as follows:

"The legislature shall appropriate such funds as are necessary to carry out the purposes of this chapter: *Provided,* That any appropriation which the legislature may make for the payment of old age assistance grants shall be specifically earmarked for such purposes: *Provided further,* That when it shall appear that funds available for the payment of assistance will not be sufficient to meet need in full for the balance of a biennium, the department may by rule and regulation put into effect ratable reductions in the amount of assistance to be paid for the ensuing quarter or quarters of such biennium, or such portion of any quarter as may be necessary. Such reductions shall be based on determined need."

The contention appears to be that, by applying ratable reductions in the amount of grants, the possibility of creating a deficit in the appropriation made in chapter 3 could be avoided. That this idea is pure theory, is shown by the fact that the department, operating under the statute above quoted for the last two years, incurred a deficiency in the amount of $3,245,000, which was appropriated by the 1953 legislature (chapter 13, Laws of 1953). In addition, there was a deficiency appropriation to the department of health in the amount of $5,600,000 (chapter 6, Laws of 1953), which was to a large extent occasioned by medical care afforded to recipients of public assistance and other needy persons (RCW 74.08.140).

Thus, from experience in the operation of the public

assistance program it is plain that deficits can and do arise in spite of ratable reductions.

For this reason, we hold that RCW 74.08.270 has no bearing upon the referability of §§ 7 and 36 of chapter 174.

Because the questions involved in this case are of public importance and because our most recent decision on this subject (*State ex rel. Pennock v. Reeves, supra*) was decided by a much divided court, we have undertaken to reexamine our former decisions and applicable statutory provisions at some length.

Since, for the reasons above stated, we find no reasonable basis for overturning the presumption that the legislative declaration that chapter 174 (when considered together with chapter 3) is necessary for the support of the state government and its existing public institutions is correct, relator's application for a writ of mandamus must be denied. It is so ordered.

GRADY, C. J., MALLERY, HILL, HAMLEY, WEAVER, and OLSON, JJ., concur.

FINLEY, J., concurs in the result.

SCHWELLENBACH, J. (concurring)—I concur in the result arrived at by the majority because I am convinced that there was an emergency requiring that this act go into effect April 1st. However, I do not concur with the majority's interpretation of the seventh amendment. My views were discussed quite fully in my concurring opinion in *State ex rel. Pennock v. Reeves*, 27 Wn. (2d) 739, 179 P. (2d) 961.

Art. II, § 1 (b), of the constitution (the seventh amendment) provides:

"Referendum. The second power reserved by the people is the referendum, and it may be ordered on any act, bill, law, or any part thereof passed by the legislature, *except such laws* as may be necessary for the *immediate* preservation of the public peace, health or safety, support of the state government and its existing public institutions, either by petition signed by the required percentage of the legal voters, or by the legislature as other bills are enacted. . . ." (Italics mine.)

Section 1 (c) provides:

"*No act, law, or bill* subject to referendum shall take effect until ninety days after the adjournment of the session at which it was enacted. . . ." (Italics mine.)

To state it another way, no law passed by the legislature shall take effect until ninety days after the adjournment of the legislative session unless some emergency arises which requires that it shall go into effect immediately. Prior to the enactment of the seventh amendment, Art. II, § 31, of the constitution provided that no law, except appropriation bills, should take effect until ninety days after the adjournment of the session in which it was enacted unless in case of any emergency. There are no cases in our reports involving any emergency laws enacted by the legislature under that clause. However, since the enactment of the seventh amendment, the legislature has seen fit to attach emergency clauses to a goodly percentage of the laws enacted. For example, of the two hundred ninety laws enacted by the last regular session of the legislature, sixty-three, or 22%, had emergency clauses attached to them. Two of these emergency clauses were vetoed by the governor. The result is that, of the two hundred ninety laws passed, sixty-one went into effect immediately and two hundred twenty-nine will become effective at the expiration of ninety days from the adjournment of the legislative session.

Naturally we should give credence to an expression of an emergency by the legislative branch of the government. However, there is nothing sacred about such a legislative expression (at least the governor did not consider it so in two instances). The legislature has no right to tack an emergency clause onto an act in order to prevent the people from exercising their right of referendum.

The judicial branch of the government owes a duty to the people, in order to protect their right of referendum, which they took unto themselves when they passed the seventh amendment, to scrutinize closely every act containing an emergency clause coming before it for its con-

sideration, and to determine whether or not, *as a matter of fact*, an emergency actually did exist in each given case.

My understanding of the seventh amendment is this. Under the provisions of subdivisions (b) and (c), we must first examine the act in its entirety and determine whether or not an emergency exists. If there is an emergency, then neither the act nor any portion thereof can be subject to referendum. On the other hand, if the act itself is not actually emergent, then the people may refer the entire act, or any part thereof.

In determining whether or not an act is emergent, we must decide whether it is necessary for either the *imme-diate* preservation of the public peace, the *immediate* health or safety, or the *immediate* support of the state government and its existing institutions. In determining this question, we must recognize that such act, if not emergent, would go into effect ninety days after the adjournment of the legislative session. An emergency clause may not be attached to an act merely because (as stated by the majority) the act "is necessary for the support of the state government and its existing public institutions." It may be attached because the act is necessary for the *immediate* support of the state government and its existing public institutions; so *immediate* that it must go into effect *now*, and cannot wait until ninety days after adjournment. We cannot take into consideration the fact that, if an act or any portion thereof may be referred by the people to themselves, such act or the portion thereof referred would not then become effective until after that question be decided by the people at the next general election. Our only concern is whether an act is so emergent that it must go into effect *immediately* rather than ninety days after the adjournment of the legislative session.