[No. 36021.   *En Banc.*   June 12, 1961.]

THE STATE OF WASHINGTON, *on the Relation of Harley H. Hoppe, Plaintiff, v.* VICTOR A. MEYERS, *as Secretary of State, Respondent.**

*Reported in 363 P. (2d) 121.

*Alfred J. Schweppe*, for plaintiff.

*The Attorney General, Philip R. Meade* and *Stanton P. Sender, Assistants*, for respondent.

ROSELLINI, J.—This matter is before the court on an original application for a writ of mandamus, filed by a registered voter on behalf of himself and a corporation called "Overtaxed, Inc." to compel the secretary of state to submit to the people by referendum a portion of chapter 7, Laws of 1961, Ex. Ses. This act increased the motor-fuel tax and use-fuel tax from six and one-half cents to seven and one-half cents per gallon. The act provides that one-quarter cent of the increased tax shall be "paid into the motor vehicle fund and credited to the Puget Sound reserve account

created by section 18 of this amendatory act of 1961." The relator claims that the levying of this one-quarter-cent increase in the tax is unnecessary and is therefore subject to referendum.

In order to present a picture of the role which this levy plays in the legislative program for the support of the highway system, we will summarize as briefly as we can certain pertinent portions of relevant acts of the 1961 extraordinary session.

Chapter 7, § 18, provides that the moneys deposited in the Puget Sound reserve account shall be used by the Washington toll bridge authority only for the purposes thereinafter set forth. Section 19 provides that when the funds in the Puget Sound reserve account shall exceed one million dollars, the excess shall be transferred from the account' and expended by the state highway commission, pursuant to proper appropriation or reappropriation for state highways for other state highway commission purposes.

Section 20 authorizes the pledging of funds in this account to guarantee bonds issued to refund the outstanding ferry system and Hood Canal bridge revenue bonds, or subsequent parity bonds issued to pay costs of constructing additional transportation facilities for the crossing of other parts of Puget Sound, or to meet any sinking fund requirements or reserves established by the authority with respect to any new bond issues provided for in the section.

Section 21 provides that, notwithstanding the provisions of § 19, no funds shall be transferred from the account to be used for highway purposes so long as an obligation for which the account is pledged is due and unpaid. This section also contains an agreement by the state to continue to deposit revenues from taxes in the reserve account and to continue to impose such taxes so long as there exists any outstanding obligation for which the account is pledged pursuant to the authority granted in § 20. Section 22 provides for the investment of funds in the account which are not needed for purposes authorized in § 20.

In chapter 9, § 1, Laws of 1961, Ex. Ses., the Washington toll bridge authority is authorized to issue revenue bonds to refund all or any part of the authority's outstanding 1955 Washington state ferry system refunding revenue bonds and 1957 ferry and Hood Canal revenue bonds, and is also authorized to issue additional revenue bonds in parity therewith to pay costs of other improvements, provided they are expressly authorized by the legislature.

In § 2, chapter 9, the toll bridge authority is authorized to establish a fund to be called the "ferry improvement fund" into which are to be placed the net revenues from the operation of the ferry system and Hood Canal bridge.

Section 3 provides that to the extent these revenues are insufficient to pay obligations on the bonds authorized in § 20, a first and prior charge is imposed upon the reserve account and the revenues derived from the one-quarter-cent fuel tax, which are required to be deposited in that account, and the funds in this account are to be used to pay these obligations.

This section further provides:

" . . . Any moneys from the Puget Sound reserve account used by the authority to pay such obligations shall be repaid by the authority to the motor vehicle fund from tolls of the Washington state ferry system and the Hood Canal bridge and tolls shall be continued for any required additional length of time necessary for this purpose."

Section 5 directs that the ferry system shall be efficiently managed and maintained as a revenue-producing system and provides for the revision of tolls to meet the minimum annual debt service requirements.

Section 7 provides for the repayment from revenues of any expended part of the appropriation provided in § 8 for the operation and maintenance of the ferries and the payment of principal and interest on the outstanding 1955 and 1957 bonds. Section 8 also provides that the unexpended part of the appropriation shall lapse whenever such bond issues are refunded.

Section 9 directs the toll bridge authority to periodically report to the joint fact-finding committee on highways,

streets, and bridges its plans and progress relating to the financing and refinancing of the Washington state ferries and Hood Canal bridge, *including the issuance of the bonds authorized by chapter 9*, to the end that the committee may be informed of plans which may affect its recommendations to the legislature.

Chapter 19, Laws of 1961, Ex. Ses., the general appropriation act for highways, appropriates from the Puget Sound reserve account to the Washington toll bridge authority for the biennium ending June 30, 1963, the sum of one million seven hundred thousand dollars or so much thereof as may be necessary to carry out the provisions of § 3, chapter 9, Laws of 1961, Ex. Ses.

These provisions reveal that the legislature adopted a comprehensive plan for the immediate refinancing of outstanding bonds of the ferry system and Hood Canal bridge. While the revenues from these operations are expected to be used to pay the principal and interest on the refunding bonds, a tax is levied and a reserve account is set up to guarantee the bonds, since the act discloses that it was contemplated that those revenues would not be adequate for the purpose. While the proceeds of the one-quarter-cent increase in the motor-fuel tax are made available to pay the principal and interest when due, provision is made for the ultimate repayment of the funds expended from this reserve account out of revenues of the ferry system and the bridge, so that the highway system as a whole will be the ultimate beneficiary of this tax.

While the toll bridge authority is not directed to issue refunding bonds, but is simply authorized to do so, it is evident that the legislature contemplated that the program would undoubtedly be carried out. For the time being, the reserve account can only be used for this purpose. While there is an appropriation to pay the principal and interest on outstanding bonds, this appropriation will lapse "whenever such bond issues are refunded." There is an express appropriation of funds in the account for this purpose, and the toll bridge authority is directed to report to

the proper legislative committee on its progress in the matter.

It is quite apparent that the legislature considered this refunding program a necessary and desirable one. The governor's messages to the legislature show that he considered legislation for the relief of the toll bridge authority's financial problems "urgent and a matter of good business." One of the compelling considerations for the refunding of the outstanding bonds, as shown by the agreed statement of facts in this case, is that the debt service for the coming biennium could be reduced by $3,000 a day if the refunding were accomplished at a four-per cent-interest rate; that it is likely the bonds can be sold at that rate; and that if the refunding is not accomplished, a motor-vehicle-fund subsidy in the sum of $2,170,702 would be necessary during the biennium. The toll bridge authority took immediate action to inaugurate the refinancing program when it received the legislative authorization.

The relator and his principal, "Overtaxed, Inc.," do not question the right of the legislature to determine what taxes are necessary to supply the needs of the highway system in general; and we can assume—from the fact that the only portion of the tax which they wish to have referred, is that which is to be used temporarily for the purpose of securing the refunding bonds for the ferry system and the Hood Canal bridge, and eventually to be repaid to the motor vehicle fund from revenues of the system—that had this use of the proceeds of the tax not been authorized, they would claim no right to have the tax measure submitted to the people by referendum. The legal proposition upon which they rest their case is that this portion of the tax is not necessary, because, although the proceeds are earmarked by the legislature for a specific use, the toll bridge authority is not commanded to use the proceeds but is merely authorized to do so. Since it was not a necessary tax, the relator says, the question of whether the tax should be levied must be submitted to

the people by referendum if the necessary signatures can be secured to his petition.

Amendment 7, § 1(b), of the state constitution, providing for the power of referendum on any act, bill, law, or any part thereof, exempts from the power,

" . . . such laws as may be necessary for the immediate preservation of the public peace, health or safety, support of the state government and its existing public institutions, . . ."

The word "or" was apparently inadvertently omitted before the word "support," and this court has always construed the section as though that word had not been omitted.

Chapters 7, 9, and 19 contain emergency clauses reciting that they are necessary for the immediate preservation of the public peace, health, safety, or the support of the state government and its existing public institutions.

■ With regard to the weight to be given such clauses, the rule to which this court has most consistently adhered, is that most recently stated in *State ex rel. Pennock v. Coe*, 42 Wn. (2d) 569, 257 P. (2d) 190, quoting from *State ex rel. Pennock v Reeves*, 27 Wn. (2d) 739, 179 P. (2d) 961:

" ' . . . such legislative declaration of emergency and necessity for the enactment is conclusive and must be given effect, unless the declaration on its face is obviously false; and, in determining the truth or falsity of the legislative declaration, we will enter upon no inquiry as to the facts, but must consider the question from what appears upon the face of the act, aided by the court's judicial knowledge. *State ex rel. Hamilton v. Martin*, 173 Wash. 249, 23 P. (2d) 1. We must give to the action of the legislature and its declaration of an emergency every favorable presumption.' "

■ It is stipulated that the ferry system and the bridge are parts of the highway system of this state and that this system is an existing institution. As we said in *State ex rel. Blakeslee v. Clausen*, 85 Wash. 260, 148 Pac. 28, a public institution is any organized activity created or established by law or public authority. It is not alone those institutions of a physical character but also, all branches

and departments created by law and exercising any activity or function defined by the legislature and existing at the time the amendment was adopted, or which, if newly created by the legislature have not been rejected by resort to referendum.

In that early and leading case, we also defined very broadly the meaning of the word support, as it is used in amendment 7, saying that the people intended to use it in its fullest sense, and that,

"In the absence of an express reservation, it would be a usurpation on the part of any court to say that an appropriation directed to the maintenance of the existing activities of the state is subject to the referendum. The first right of government is the right of self-preservation, and to say that the people intended, in the absence of an express reservation, to allow the government or its institutions to be crippled or embarrassed in any way would be to say that the people intended that the government could not sustain itself through the mediumship of the ordinary and recognized methods of legislation."

It was further held in that case that the word "immediate" does not qualify the words "support of the state government and its existing institutions" but only qualifies the words "preservation of the public peace, health or safety." An appropriation for highway surveys, construction and maintenance during the succeeding biennium was held not subject to referendum.

Subsequently it was held that statutes levying taxes are laws for the support of the state government and its existing institutions. *State ex rel. Reiter v. Hinkle*, 161 Wash. 652, 297 Pac. 1071.

It is therefore clear that the law, a portion of which the relator desires to have submitted to referendum, is a law directed to the support of an existing institution of the state government. But, as we have already noted, the relator contends that the law is not *necessary*, because it does not direct nor require a refunding of the outstanding bonds. Our inquiry into this question must be limited to an examination of the act and to matters of which we can take judicial notice, bearing in mind that it must be pre-

sumed that facts existed which justified the legislative determination that the law was necessary.

If we accept the relator's theory, we must hold that no act of the legislature which leaves any decision to the discretion of an administrator can possibly be a necessary act. In other words, there can never be a situation in which the legislature finds it necessary to authorize an action, but determines that it would be inappropriate or unefficacious to direct that the action be performed.

The only case which the relator cites for his proposition is *State ex rel. Robinson v. Reeves,* 17 Wn. (2d) 210, 135 P. (2d) 75, 146 A. L. R. 280. That case was concerned with the proposed referendum of an act which authorized the acquisition and operation of public power resources and public utilities by certain public authorities and municipal corporations. It was neither a revenue measure nor an appropriation act, and did not provide for the financial support of any existing institution. We held that the act was subject to referendum because it was not necessary for the immediate preservation of the public peace, health or safety, or for the support of the state government and its existing institutions. This was unquestionably correct.

In arriving at this decision, this court stated the rule to be that, if the act does fall into one of these two categories, the legislative declaration of emergency or necessity is conclusive, and the act cannot be referred. (This is more restrictive on reviewing power of the court than is the rule approved in *State ex rel. Pennock v. Coe, supra,* which permits the court to reject the declaration if it appears on the face of the act, or from facts within the court's judicial knowledge, that it is false.) If the rule stated in the opinion was the one which was applied in the case, dictum contained therein, on which the relator rests his case in this hearing, must inevitably have been based upon an assumption that an act which does not belong in one of the two categories may nevertheless be exempt from referendum if it is a necessary law. The court, in this dictum, observed that the law was permissive, rather than

mandatory, and therefore could not have been the product of necessity.

It is difficult to imagine how a law having the purpose of providing for the creation of public utility districts could wisely have been made mandatory. Under such a law, municipal corporations would have been directed to acquire the public utilities which serviced their areas, whether or not it was economically feasible and whether or not the local authorities considered it desirable. Co-operative acquisition of public utilities would have to have been ordered in certain instances, and it is doubtful that the legislature would have had the time or the ability to acquire the knowledge necessary to determine where such cooperative ventures were desirable. The impracticality and inappropriateness of such a law is immediately apparent. On the other hand, is it not reasonable to suppose that the legislature found it necessary to *authorize* local action in this field, in order to meet a need which had been expressed to the lawmakers? We think the dictum in that case was ill considered and should not be transformed into a rule of law.

Insofar as the holding of the case in concerned, it does not serve the relator's purpose. If the rule stated therein is the law, his contention in this case is obviously without merit, since we have a law admittedly directed to the support of an existing institution. This being the case, the legislative declaration of necessity is conclusive.

■ However, insofar as that case held that a legislative declaration of emergency or necessity is conclusive if, by reasonable inference, the act can be said to be an exercise of the police power or in financial support of the state government or its existing institutions, it was overruled *sub silentio* in *State ex rel. Pennock v. Coe, supra* (in which it was quoted at some length), and is hereby expressly overruled.

The implication found in that case that an act which does not fall into one of the two categories designated in the seventh amendment may be exempt from the power of referendum, ignores the provisions of that amendment

and is insupportable in law. And insofar as dictum in the case may have implied that an act which contains provisions authorizing, rather than compelling, action can never be a necessary law, that dictum is hereby rejected.

There are many actions which the legislature finds it necessary to authorize, but which it would be undesirable to direct or require. In this instance, it readily can be supposed that information was placed before the legislature which convinced a majority of its members that the refunding of the outstanding bonds should be authorized. But the legislature could hardly direct the refunding of these bonds, since that process will require the consent of third persons. The legislature could justifiably rely upon the toll bridge authority to exercise the authority conferred upon it, which it had undoubtedly requested after careful study.

There is no reason to doubt but that the lawmakers were convinced that the body upon whom the authority was conferred would exercise it wisely to alleviate, and if possible resolve, its acute financial problems. The conferring of authority was therefore all that was necessary to achieve the legislative purpose.

The provisions which the relator attacks are those levying the tax which is to be paid into the Puget Sound reserve account. These provisions are not permissive. A tax is not merely authorized, but is levied. A reserve account is not merely permitted, but is created under § 18. It can be used only for specified purposes and, for the time being, only to secure the refunding of outstanding bonds. It is solely in determining whether the funds shall be used that the toll bridge authority is given any discretion. We must assume that the legislature found it necessary to authorize the use of such discretion, nothing to the contrary appearing in the act nor in the facts of which we have judicial knowledge.

We hold that the mere fact that a given law authorizes, rather than directs, certain actions to be taken does not conclusively establish that the law is unnecessary; but, in determining whether the legislative declaration is

false, this fact must be considered in conjunction with other facts appearing on the face of the act and facts within the court's judicial knowledge. In this case, the facts do not justify such a conclusion.

Under the rule which we have stated to be the applicable law, we conclude that the legislative declaration of necessity must be given effect and that the act is not subject to referendum.

Having taken this view, we find it unnecessary to decide whether, as the respondent contends, the proposed referendum would be illegal because it would necessitate a rewriting of the statute.

The writ is quashed.

FINLEY, C. J., MALLERY, DONWORTH, WEAVER, and HUNTER, JJ., concur.

OTT, J., did not participate.

HILL, J. (concurring)—I agree that the order of May 17, 1961, quashing the alternative writ of mandate, was properly entered. I am, however, not in accord with the reasons given therefor in the majority opinion.

The plaintiff's own statement as to what he desired to have referred to the people was a follows:

"(1)   That portion of section 1 of the said act levying one-quarter cent tax which 'shall be paid into the motor vehicle fund and credited to the Puget Sound reserve account created by section 18 of this amendatory act of 1961';

"(2)   That portion of section 2 of the said act levying a one-quarter cent tax which shall be paid into the motor vehicle fund and credited to the Puget Sound reserve account created by section 18 of this amendatory act of 1961;

"(3)   That portion of section 4 of said act levying one-quarter cent tax which 'shall be paid into the motor vehicle fund and credited to the Puget Sound reserve account created by section 18 of this amendatory act of 1961'."

There was nowhere in §§ 1, 2, and 4, or elsewhere in the act with which we are concerned, a levy of a "one-quarter cent tax."

Section 1 of the act provided that:

"Every distributor shall pay, . . . an excise tax . . . of *seven* and one-half cents for each gallon of motor vehicle fuel sold, distributed, or used by him in the state . . ."

and then provides how the tax shall be distributed.

Section 2 imposes a like tax on,

"Every person other than a distributor who acquires . . . or imports such motor vehicle fuel into this state, and sells, distributes, or in any manner uses it in this state . . ."

and then provides how the tax shall be distributed.

Section 3 imposes a like tax "on the use of fuel by any user thereof."

Section 4 imposes no tax but provides for the distribution of the "proceeds of the use fuel tax."

The plaintiff would, I believe, concede that he could not rewrite the act in question under the referendum provision by substituting "a tax of seven and a quarter cents" for the "tax of seven and one-half cents."

Each of the taxes imposed is seven and one-half cents per gallon and is not severable for the purpose of a referendum. What the plaintiff is actually dissatisfied with is not the levy of a quarter-cent tax, but the distribution of so much of the proceeds of the taxes imposed, as a quarter-cent tax would raise, into the motor vehicle fund to be credited to the Puget Sound reserve account for the permissive refunding of certain Toll-Bridge-Authority bonds.

Actually, the entire seven and one-half cent tax must, under the state constitution (amendment 18), "be paid into the state treasury and placed in a special fund to be used exclusively for highway purposes." It is then siphoned off for various kinds of "highway purposes."

I disagree with the majority and agree with the plaintiff that there is no emergency, so far as creating a source for the possible refunding of Toll-Bridge-Authority bonds is concerned, and that the whole plan might properly be referred to the people.

To avoid the constitutional debt limitation, the Toll Bridge Authority and other "authorities" issue bonds which state

specifically that they are not general obligation bonds; and we are solemnly assured by judicial decision that they do not constitute an indebtedness of the state of Washington. Such being the case, I fail to see how the possible refunding of the bonds in question is necessary for the preservation of public peace, health or safety, or for the support of the state government and its existing institutions.

Solely because the referendum is directed against the levy of a nonexistent quarter of a cent tax, or a nonseverable portion of a seven and a half cent tax, I concur in the quashing of the writ. I disagree, as indicated, with the idea that the desirability of the permissive refunding of the Toll-Bridge-Authority bonds constitutes an emergency, depriving the people of their reserved right of referendum.

FOSTER, J., concurs with HILL, J.